May it please the court, my name is Dan Albin and I represent the plaintiffs' appellants in this case, Ndioba Niang and Tamika Stigers, who are here in the courtroom. I'd like to reserve three minutes for rebuttal if I could. You may, but you'll have to watch your own time. Understood, Your Honor. Thank you. The board admits in this case that Missouri's cosmetology and barbering licensing scheme does not require any training or any testing on hair braiding, and it concedes that less than 7% of the required 1,500 hours of cosmetology training are even generally relevant to braiders. As the district court recognized, the fit is awful. This is a blatant attempt to bootstrap a burdensome regulatory scheme based on what the district court called a marginal overlap and found was minimally related to government interests. It is the same sort of unconstitutional mismatch that this circuit struck down under rational basis review in Pieper v. Calloway County, where only one in six provisions, or about 17%, of a challenged board resolution advanced a legitimate government interest. This unconstitutional mismatch arises because Missouri is trying to shoehorn African-style hair braiders into a wholly different occupation, either cosmetology or barbering. But aren't those defined so broadly they include anything to do with hair? Hasn't the state of Missouri defined those so very broadly? They have defined them broadly, Your Honor, and that's precisely the problem. Anything to do with hair, the way I read it? You're welcome to tell me. No, I think that's correct, Your Honor, and that's why we're challenging— And hair braiding deals with hair, so— Absolutely, Your Honor, and that's why we're challenging the application of this incredibly broad statutory definition to supposedly catch up any occupation that deals with hair, even if it's separate from cosmetology or barbering. The record shows that the board admits that African-style hair braiding is a separate occupation— Now, wait, wait. I don't think they quite say that. We tried to check that out. I don't think they say it's a separate occupation. Now, tell me what you're relying on. You've said it several times. Sure, Your Honor. I'm looking at the joint appendix at 1747, as well as in the addendum on page 39, you can see one of the many legislative reports that they did in, I think, this one that's in the addendum. Well, wait. In 1747, you say the board admits that hair braiding is a different occupation, and the response is denied and disputed. Right. Well, the deny and the dispute there, Your Honor, is a sort of generic objection that the board offered with response to all of the testimony from their 30B6 witness. They said that the board has not voted on the testimony offered by the witness. But, of course, boards don't have to vote on testimony offered by 30B6 witnesses. And so these general objections that the board continually offers, they aren't worth anything. They're just a general objection. You mean you're saying this man, Carol, is that a man? Emily Carol is the executive director of the board who was testifying. You say she admitted that it's a different occupation? She did, yes, Your Honor. And the citation to her testimony in the deposition is provided there at 1747. How would we find a deposition page? That is included in the joint appendix, as well, Your Honor. I don't have the The joint appendix, I believe it's volume two or three, includes Emily Carol's deposition. And she was testifying as the 30B6 witness on behalf of the board. She admitted that it's a different occupation. She also admitted in the joint appendix at 1800-1801 that African style hair braiding satisfies the board's definition for a distinct profession. The board admits at joint appendix 1743 through 46 and 1753 through 55 that African style hair braiding has a distinct history with different cultural, racial roots, and it was designed for tightly textured hair, that it rejects European cosmetology's reliance on chemicals and heat to straighten hair. And the board also admits at joint appendix 1744 to 45 and 1750 to 65 that these are totally distinct services and techniques that only use simple tools and don't use the heat and chemicals that are used in cosmetology and barbering. On top of all those concessions, Your Honor, the board also admits that these services are provided by two totally different groups. The board admits at joint appendix 1748 through 49 that cosmetologists and barbers don't generally offer any braiding services at all, let alone African style hair braiding. And they also admit that those who do provide African style hair braiding generally are not cosmetologists or barbers and do so at salons that usually exclusively offer African style hair braiding services. And those concessions- You're saying there's no overlap, there's no traditional salon that also includes the African style? I'm not saying there's not a single one, Your Honor, but I'm saying these are largely separate groups. And even in the salons where some of those services are offered, they're generally offered by different people. So for instance, my client, Tameka Stigers, has a salon that offers hair braiding services. There are also cosmetologists and barbers who work at that salon, but it's those cosmetologists and barbers who offer the additional services and the braiders only offer hair braiding services. So it's the facility that offers the multiple services, not the individual provider? Yes, Your Honor, that's correct. And that's in the joint appendix at 1747 through 50 and 1800. As a result of the licensing requirement, Your Honor, braiders must spend nearly a year taking classes to get just about two weeks of training that is barely related to hair braiding on topics such as salesmanship and shop management, state law, and anatomy. The remaining 1,400 hours of required cosmetology training are spent learning specific discrete services such as bleaches, thermal curling, facials, and manicures that African-style hair braiders do not perform and often reject on principle. Jobe and Young and Tameka Stigers are both African-style hair braiders who only braid hair naturally with their hands and with simple tools. They don't give haircuts, and they don't use powerful chemicals or heat to style hair. Jobe and Tameka have no interest in becoming cosmetologists or barbers, and they cannot afford to spend... No, no, wait, wait. They have no interest in becoming, as they define, cosmetology and barbering, not as the state of Missouri does, right? Yes, Your Honor. They don't want to become what is traditionally understood to be a cosmetologist or a barber. Proceed, proceed. They can't afford to spend thousands of hours, nearly a year of their lives, and tens of thousands of dollars in order to obtain an irrelevant license in a different occupation. What about the health issues that are pointed out by the doctor in the deposition? Dr. Gathers, I guess it is. In her declaration and in her deposition, she goes on about the health issues and how braiding could cause serious harms to people's hair, heads, scalp, and all that. Yes, Your Honor. So the defendant's expert, the board's experts, identified sort of two categories of health and safety concerns. They first identified sort of general health and safety concerns that would apply to anyone engaged in grooming or hair care services. And those are covered by that 100 hours of training that the board contends are relevant out of the 1,500. It's those 100 hours that cover sort of general sanitation practices, that sort of thing. The board also identifies three specific concerns they have that are specific to African-style hair braiding. And the board's experts identified those. But the board admits that those three specific health and safety concerns aren't required to be taught or tested, that they can't ensure any training, that they are— Counsel, I think you're missing the point here. As you know, if the state, under the Beach case of the Supreme Court and under the Kansas City Taxi case of this court, if the state has a conceivable basis for drawing the line on a rational basis, it survives, right? Not quite, Your Honor. If you disagree with the Beach case and you disagree with the Kansas City Taxi case— I don't, Your Honor. It says conceivable five times in both cases. It does say that. And so the state can say— I made up the five times. I think it's more than that in the one case and less than that in the other. But go ahead. It does say, Your Honor, that the legislature can pursue conceivable interests. And here, the conceivable interest is one that the plaintiffs don't contest. There are health and safety issues related to braiding. And the plaintiffs don't argue against those. Just like in the Gallagher case, there are health and safety issues related to outdoor secondhand smoke. That's uncontestable. Well, in this case, plaintiffs aren't disputing whether or not there is a legitimate concern that the government is trying to address. Plaintiffs are going after the means and fit. They say, look, there is no rational connection between requiring someone to get educated in these two separate occupations that don't teach or test the information that's necessary for braiders in order to address the health concerns about braiders. This is an unconstitutional mismatch, Your Honor, because the board is trying to bootstrap these few hours, 100 hours out of 1,500, into an entire licensing scheme, almost all of which is totally unrelated. What about the inspection after licensing and all that? They have a board. They have experts. They have all this stuff. What about that? Because once you're licensed, they kind of know where you are. They kind of know who's doing it. They can inspect. What about that part of it, which I don't think either of you talk very much about? The reason we don't talk about it, Your Honor, is because that's actually a separate license that plaintiffs aren't challenging. That's a salon license. Plaintiffs are only challenging the individual license that each individual person has to get, be they a braider or a cosmetologist or a barber. Don't they have to identify their location on their license and keep the board told of where they are, what their license, what their location is? I'm not sure if they have to do that on their individual license, Your Honor, but the establishment license, of course, identifies the location of the establishment. You surely have to do it on the individual license, too. I think you do for all other state licenses. I've got three or four. It's certainly plausible that they would, Your Honor, but regardless, the establishment license is the license that governs inspections and empowers the board to conduct those inspections. So when the board goes to a specific salon or barbering establishment, it's the salon license that it's conducting the inspection under, and the person who gets a notice of violation is typically going to be the establishment owner. So it's the establishment license, which plaintiffs don't challenge in this case. Once you have a license, you can be disciplined by that board. That board does discipline, correct? Yes, it does, Your Honor. Okay. And that can be the individual license that gets disciplined, right? The board can discipline the individual licensee. Why isn't that enough of a match here between the health and the licensing and everything? Well, that's a classic example of bootstrapping, Your Honor. If it was enough to say that there needs to be a board that can discipline someone for engaging in some sort of bad practices in their occupation, and that is sufficient to justify requiring someone to be licensed in a totally different profession, any profession could be licensed as a cosmetologist or barber, because that would empower the board to discipline, say, So the mere fact that— You said the magic word lawyers to me. Sure. What about the fact that many lawyers do the bar exam, and all that stuff's completely irrelevant to everything they ever do as a lawyer all the rest of their career, and they're required to, unlike these sort of professions, you're required to do that, et cetera, et cetera. How do you—you've thought about that. Tell me an answer. Sure. Well, I don't think everything you do on the bar exam is totally irrelevant, Your Honor. But the law is a much more theoretically complex profession than the grooming professions, and lawyers need to be able to spot issues outside of their own specialty area because they need to be able to recognize when their client is potentially at some sort of legal risk or has legal rights that are at stake, they have a fiduciary duty that requires them to do so. And there's a common analytical framework for the law that allows lawyers to be able to,  understand how the law applies, and then apply it to a given area. Now, that's very different from the grooming professions, where there's very small sort of theoretical backbone, and instead you spend almost all of your time, the 1,400 out of the 1,500 hours, learning how to perform discrete specific services that are unrelated to each other. You don't need to know how to leach hair in order to do pin curls. You don't need to know how to do manicures in order to perform a facial. These are unrelated tasks that don't have the same common theoretical background. But wouldn't that be the same for, so I just want to cut hair, and I don't want to do manicures or facials. Do I have to learn that as well? Well, as a barber, that is the focus of the barbering license, Your Honor. And so I guess I'm trying to work on a line drawing here. So all I want to do is cut hair. Right. And I'm never going to do anybody's nails. I'm never going to do a facial. I'm not even going to shave your beard. Why wouldn't then I get to carve out a special license for myself? Where's this line that we need to draw? Well, I don't think the court has to draw a specific line, Your Honor. And in the context of someone who just wants to cut hair, there's a barbering license that the vast majority of which is geared toward someone who wants to cut hair. There is some extra information taught about shaving and toupees and that sort of thing. But the bulk of it is about hair. Well, how many hours are enough? I noticed on this chart about curriculum, there are certain undefined hours, miscellaneous hours. Suppose some or all of those were allocated to African hair braiding. So the number went up from 100 to 400. Would that be rational at that point? How would you suggest the court administer this test that you're proposing? Sure. I don't think that would still be rational, Your Honor. And the record indicates that that is not the case, that braiders can't spend that amount of time doing that, even under those discretionary hours, because they're not being taught those services in the school. And so they're not able to then just free wheel on their own during those voluntary hours. But let me direct to the question that both Judge Kelly and you raised, Your Honor. Before you get to that, explain what you mean. The record shows they're not allowed to free wheel during those hours. What does it show about what happens during those hours? Sorry, I may have misspoke, Your Honor. The record shows that braiding is not taught during the other hours. And so when you're demonstrating the techniques, which is what happens in those extra hours that you're talking about, the discretionary hours, African-style hair braiders don't typically have someone that they can be demonstrating African-style hair braiding techniques to. And so it's generally not something that can be done during those hours. But I think the more- Is there anything that prevents the people who set the curriculum from modifying it if there are more African hair braiders who are seeking the license? I think it's possible that they could, Your Honor. But the record reflects that less than 10 of the 96 schools even offer any instruction on braiding. And very few, if any, of those offer African-style hair braiding. This board licenses the schools too, right? Yes, it does, Your Honor. And inspects the schools. It does, Your Honor. So to return to the question about where do we draw the line and at what point does it become irrational or arbitrary, this court has already drawn a line in Pieper where it found that when only one of six provisions advances a legitimate government interest, that that is an unconstitutional mismatch. And it struck down the board's resolution in Pieper even though it recognized that one of those provisions did in fact advance a legitimate government interest. In the context of braiding, district courts have looked at the overlap between the practice of African-style hair braiding and cosmetology and barber licensing. And in the case of Clayton in Utah and Cornwell in California, found that up to a 30% overlap in Clayton and up to a 10% overlap in Cornwell was an unconstitutional mismatch. And that's why the 7% at issue here, Your Honors, is an unconstitutional mismatch. If I could, I'd like to reserve the remainder of my time. You may. We'll hear from Ms. Blake. There are some seats down in the front. If any of you folks standing in the back prefer to sit down, you're welcome to come up front. Ms. Blake, we'll hear from you. Good morning. May it please the court. My name is Julie Marie Blake. I'm the Deputy Solicitor General for the state of Missouri. I represent the board today. This case is not about the best way to license hairdressers, barbers, or hair braiders. It's about who gets to decide the best way to license hair braiders. And with that in mind, I'd like to go straight to the questions that Judge Ben has been asking, where he pointed out the standard of review that governs this case, a standard of review that's not in dispute, and that's been clearly set forth in many Supreme Court cases. The state need only show a conceivable basis. They agree with that. To justify its laws. Exactly. Yeah, go ahead. They agree with that. And they also agree about the legitimacy of the state interest in this case. Many of the cases they cite, concern cases where the state asserted an illegitimate interest. We don't have any dispute about the legitimacy of the state interest here. It's only a question about the fit in this case. So is there any fit requirement under rational basis review, in your view? There is. And the fit requirement is that it needs to be a conceivable fit between the interests and the means selected in the statutes and regulations to achieve those interests. Do any of these cases use the term conceivable fit? I'm sorry. Well, go ahead. I'm curious what you mean by conceivable fit. Me too. Perhaps a different word would be rational or reasonable. Usually, it talks about interest conceivably served by these interests. There is some sort of fit. But it doesn't need to be the same type of fit as intermediate or strict scrutiny. Well, if there's a requirement of some degree of fit, how much is required? That the legislature or the lawmaker could conceivably have thought that these interests would be served by the statutes at issue. Isn't the exception in 316.265 pretty bad for your argument? Are you referring to the one for festivals and shows? Yes, for sure. And it says there they don't need a license at all. And they're not even subject to the cosmetology and barbering if they are doing this with someone who has a license to put on a contract or show. And I think that what we have to do is look to the standard review for those where the Supreme Court said you don't need to achieve your ends with mathematical exactitude. Williamson, Theological, Beach, Cleaborn, all these cases talk about you don't need a perfect fit between the means and ends. You can do things in pieces. Gradually, you can make exceptions. All you need is a rough fit between the means and the ends. But does the rationality go away when you look at how licensee is defined in Chapter 316? Have you seen the long list of licensees of special events in Missouris? Drive-in theaters, picture shows, penny arcades, dance halls? It's about 20 or 30 different things listed in umpteen paragraphs there. Professional athletic exhibitions. So the boxing match, the hair braiders could do it, right? And I think what the legislature thought was that is a limited exception, not the standard course. And in that case, they decided that we could. You know, pony rides are in the list. Miniature golf courses? Well, you know, what I would counter with that is to realize that the legislature is not required to make things with a perfect fit. I'm guessing that there are, since we haven't seen any, there's no other exception within what the state calls cosmetology for getting a manicure at the pony rides. Correct. So it's just the African hair braiding is the only exception that falls under this big rubric that the state has defined as cosmetology and barber, at least as you know right now? Well, I mean, there's two exceptions in the statute. The first one we were discussing is for the practice of combing, braiding, or curling hair without harmful chemicals. So it could technically be more than just braiding at these shows and festivals. There is one other exception in the statutory scheme that could be relevant to this case. And that one is for the incidental practice of cosmetology or barbering in the course of emergency medical or domestic administration. So it makes clear that these laws don't apply, for example, to home use or in a hospital or when a doctor or a nurse would shave it. So in answer to your question, those are the two different exceptions in the scheme. But on the question of fit, we do think that the fit is reasonably made here. The question is not starting with the burden, as it would in a case of First Amendment associational rights. That's the Pieper case that opposing counsel made. What you really have to look at here is whether a reasonable person could have thought that the actual statutes and curriculum would have met the interests asserted in health, safety, in these cases. And I think if you actually look at the curriculum, you'll see that it's more related than opposing counsel would necessarily make out. Each of the classes serves one of three different interests related to health, safety, and consumer protection. General knowledge of anatomy, infections, and disease control. How to run a business in a way that protects and doesn't hurt consumers. And then the final category is understanding what other hairdressers have done to a person's hair. And as you asked in your questions before, that's very similar to what a lawyer needs to know when they take classes for a bar exam. A lawyer who does social security law or workman's comp, they probably had no classes in law school or on the bar exam related to those specialties. But they still need to understand contracts, litigation, and other things that can bear on a person's financial and legal affairs. So to hear the plaintiffs admit that they do a scalp inspection, that they look at a person's hair, and that they see if they're a suitable candidate for braiding and understanding what's previously been done to a person's hair in terms of coloring, dyes, other chemicals, haircutting is relevant to that. Just in the same way it's relevant for a litigation attorney to know how contracts work, even if they never negotiate a contract. Am I hearing you to say that there isn't agreement between the parties as to what percentage does actually directly apply to the African hair braiding? I think there might be a little bit lost in the language here. In terms of courses about braiding specifically, as in how to braid or what braiding is required, that part is correctly represented. There's little directly on the subject of how to braid. What the board does not concede and has not conceded, though, is that there is a great deal of general background information relevant to hair braiding, even if it's not directly about how to braid a hair. And that's the information on anatomy, infections, disease control, consumer protection statutes, as well as what other braiders may have done to hair so that they understand the nature of the client coming in in front of them. The plaintiffs say 7%. Do you have a percent, or do you just say it's more? I'll be happy to run through the numbers. Why don't we take the barber exam and their curriculum, because it's the lesser standard. Since your time's short, can you give us, about what percent is your best? What's your best percent? What's your worst percent? Range, estimate, give us something. 11% relates to anatomy, infections, or how to run a business and comply to state law. The rest is about whether hairdressers may have done. 11% of the total 1,500 hours, you mean? No, that's the barber exam for the 1,000 hours. The cosmetology exam is 1,500 hours. When you get to the cosmetology exam, it's a little more difficult, because 475 of those hours are general, left to the discretion of the school to decide. And the state doesn't require, for all the state has an interest, that school could devote all of those hours to braiding if that's what the school, the student picks. For the hairdressers exam, then you have 105 hours and 20 hours on the general subjects. Then the remainder of that class is for the other hairdressing skills. Did you ever give us a percent on cosmetology? You can give us a range. The other side gives us all kinds of numbers. And your experts testified on this. Your executive director testified on this. Right, so 125 goes into 1,500. It would be a little under 10%. But the board's position is that all of this general knowledge is still relevant. And this court is not engaged in evidence and fact-finding in the same way it would if there was a heightened scrutiny interest of suspect class or a fundamental right at stake. And under the Supreme Court's precedence of rational based review, there's a good reason for this court to be deferential to the state, where a reasonable person could have decided that anyone whose hands are in other people's hair all day on a commercial scale, one person in, the next person in, and so on, needs to have this general knowledge about bacteriology, sterilization of equipment, scalp diseases, how to know state law, how to do consumer protection, as well as to understand the chemicals and things that other people may have done to the hair before the person gets in the chair. Not to mention there are some incidental uses of other hairdressing that is involved in African hairstyle braiding, including some combing, some cutting incidental to the braiding process. And again, the legislature need not make these decisions with mathematical exactitude. Williamson, the law optical, says it quite plainly. They only need to say that there is a problem and that these means were a rational way to address the problem at hand. Do your briefs tell us how many states license hair braiders? I don't think so. Illinois does for sure, right? I actually can't say. Oh, you don't know. I get that from your executive director, what she told the legislature. She claimed Illinois, Oklahoma did it, surrounding states. Go ahead. And the legislature is considering this issue right now. It has considered it for the last two sessions. And far from undermining our case that there's a vigorous policy debate about whether these are the best laws, I think it actually bolsters our case because people should go to their legislature if they think there's a poor means and fit and say, look, there could be a better way to do it. And you, my elected representative, are the right person to decide this. Change the law, go to court. It is not the right way to build that type of democratic consensus for a change. Not an area of economic regulation that doesn't implicate a fundamental right or a suspect class. What are the arguments in the legislature against exempting these people? Is it a protectionism argument of some kind? Or do you know? To the best of my knowledge, it's simply a matter of other urgent priorities on the legislative docket versus time for this issue. Well, that's all right. Well, the only response the legislature's made is the public amusement entertainment venues exception, right? Which shows that the legislature may very well But the answer is yes, that's the only response. That's the only response to legislature. As well as the medical and domestic exceptions  When was that enacted, that exception? I'm not sure. 2014. One thing I'd also like to go to is another question you asked, opposing counsel, if I may. Which is, where is the line? As Judge Kelly asked. And as Judge Caldwell realized, it'd be very hard to find a neutral line to administer if this court goes into this area. There are dozens of other licensing schemes in this state and other states that would be implicated if this court goes in that a general licensing scheme is inadequate and every specialty needs their own tailored You mean some are even worse than this, counsel? Sorry? You mean some are even worse than this? Well, actually, I think other courts have found ones that are worse than this, where it actually does fail rational basis review. The St. Joseph Abbey case in the Fifth Circuit clearly is on the other side of the rational basis test from this state here. The Sixth Circuit in Craig Mile felt the same way in that case. And there are differences between those cases and this one. Those cases really had so many exceptions that they are demonstratively different from the case here. So in the St. Joseph Abbey case out of Louisiana, they had an exception that anyone could sell caskets in this state unless you were in the state. But anyone out of state, ship them in. We have nothing like that in Missouri, where we require both people out of state and in state to follow these curriculums and be in here. That level of undermining of the means unfit was what I think made the difference in that case. And that's just, that gets you into the point of actual arbitrariness here. Whereas here, a reasonable person could say, yes, if you're going to have someone's hand, your hair in someone's hands every day, you should be trained in all these things. And as you, as Ben pointed out, you should also be subject to licensure where there's discipline on you. So the state knows where you are. Consumers can go to the board with complaints. If you are subject to fraud accusations, that there's a speedy way for consumers to have a redress and a licensee to be taken out of business if there's a risk to consumers. But elaborating on the point of the other licensing schemes, if this court wades into this area, I'd like to give a court of the flavor of the different general licensing schemes that this court would need to carve out, and again, be the court, not the legislature, into different subsets and specialties. So in medicine alone, you've got the ones that we would normally think of, you know, pharmacists and things like that. Does every different surgical specialty need their own licensing scheme? I mean, people go to medical school and they say, look, all I want to be is a dermatologist. I'm never going to, you know, have to do a colonoscopy or something like that. And yet they still have to work a lot of things. Counselor, I'm not worried about that into the licensing spectrum. Missouri does physical trainers. They do all sorts of health specialties. You're starting at the top. Oh, let's start at the bottom. Real estate agents, brokers, appraisers, and escrow agents. What if you only want to do commercial real estate versus private real estate? What about plumbers? What if you want to be a certain specialty of plumber versus another kind? Land surveyors and landscape architects. I only want to have a small type of house mowing business. Why do I need to be licensed as a landscape architect to do that? But do those licenses require the type of training, the number of hours in areas that are not relevant? It seems to me that the bulk of the argument here is not the licensing per se. It's not the health and safety business related issues. There are just all these other things that are not even in my field. So is that a good analogy if you're just going between commercial and personal real estate? Well, manicurists, aestheticians, as you mentioned, are subject to the same requirements. Architects are subject to a great many requirements. Even for fields of architecture, they won't do. But again, the burden is not the starting place in this analysis. That's an intermediate scrutiny approach for abortion or associational rights. Here, what you start with is the state's interest. If it's legitimate, you see whether a legislature could rationally have thought that the means selected, while imperfect and maybe only partial, would achieve those ends. And I'd also point out that some of the other cases in which they talked about where the hair braider schemes have been struck down, they actually had far more hours of instruction that were required, 1,500 or 2,000 hours, compared to the 1,000 hours here, which puts Missouri actually on the smaller end for a general license. Well, which of the three district court cases is closest to ours in terms of hours, counsel? Three district courts have struck down these sort of deals. Can you give me one second to pull up the numbers on each case? I think Clayton is farthest away, because that one was 2,000. Cornwell was 1,600. And I actually don't have the number for Brantley. Do you have anything further? We would ask the court to affirm, because it is the legislature's choice about the best way to do this, and they could rationally have thought that it would have advanced health and safety in this case, and that the proper solution in this area is in the legislative realm. What do you think of the interest that the district court posited that the other side complaints were raised by the court on its own initiative? So I know what we're talking about. I think the court said the licensing requirement might influence the schools to create more coursework on African hair braiding, and then also that the state might create an incentive for hair braiders to offer more comprehensive services. That is, I guess, to get into barbering and cosmetology more generally. Do you endorse those interests? Yes. It's holding on those points was both substantively and procedurally proper. The standard is whether the court could conceive of any legitimate interest served by these statutes. And so it's proper for the court, sua sponte, to conceive it. As we argue in our briefs, the duty is on the other side to anticipate and affirmatively show the utter irrationality of any conceivable interest that would support this statute. That burden was not met because a judge could conceive of these two additional interests that could have been a legitimate, rational basis for this scheme here. All right. Thank you for your argument. Thank you. Mr. Albin, you have two minutes and 40 seconds remaining, so we'll hear from you in rebuttal. Thank you, Your Honor. I'd like to make three quick points in rebuttal. First of all, the board conceded here at oral argument that there is some degree of fit required under the rational basis test, and it embraces the St. Joseph Abbey and Craig Miles cases. The board concedes that Cornwell is the closest district court case to this one, where in Cornwell there were 1,600 hours. Here there are 1,500 hours. In Cornwell, the court found there was a 10% overlap. Here the board concedes there's roughly a 10% overlap. Just now, opposing counsel talked about the importance of understanding the other treatments that cosmetologists or barbers might apply to someone's hair before braiders braid that hair. But that is actually part of the 100 hours that the board contends is relevant to hair braiding. That's covered under the scalp conditions and scalp treatments, which is part of that 100 hours. So the board sort of picks a little bit of a fight over the exact percentage. It's roughly 10.5% for barbering. It's slightly under 7% for cosmetology. Under the board's own admissions, the executive director of the board admitted this in the joint appendix 1807 to 1810. I'm not quite sure where the- Has anybody done the numbers on, for example, manicurists? They have to be cosmetologists, right? There's actually a separate license, Your Honor, for nail techs and for estheticians. So they already have a specialty license. And the concerns that were raised about every profession having to have all these different specialty licenses, well, that, in fact, is the trend. So they don't have to go through the 1,500 hours? They don't have to go through the full set of hours. They go through hours that are designed specifically for nail technicians or estheticians if they're pursuing that license. The third point I'd like to make, Your Honor, relates to Judge Benton's point about the statutory exemption, which does, in fact, completely undermine the justification for the licensing scheme. It cannot be rational to say that Joba and Tamika can't braid hair at a salon, but if they just go ahead and get a license to be a pony riding shop or a carnival or a boxing match- I know you don't have any time, but the Supreme Court has said many times the legislature can tackle part of the problem now and part of it in the future. How do you respond to that? Well, this is very different. This is actually much more like Merrifield, Your Honor, because the Supreme Court has said you can address things a bit at a time, but this is an exemption to a previously passed set of licensing. Suppose you're urging the legislature to exempt them altogether. Suppose they say, well, we want to take this a little bit at a time and see if it causes any problem. Maybe we'll get some data here as to whether letting unlicensed hair braiders do the work on these incremental or discrete bases creates any public health problem. And if it doesn't, then maybe we'll be emboldened to create a broader exemption for them. What's wrong with that approach? Well, the record doesn't reflect that that's what the legislature is doing. The record reflects- There's no legislative history in Missouri Council. Be careful. Go ahead. I understand that, Your Honor. Well, I don't know what they were thinking. Do you know what they were thinking when they created the exemption? Well, yes, Your Honor. But if we don't want to talk about the legislative history, it is in fact actually in the record. If you look at the record about why the legislation was passed, at Silver Dollar City in Branson, there's a booth set up for folks who want to braid hair, and they lobbied for the exemption and were able to get it passed. But the exemption applies throughout the state of Missouri at all public amusement and entertainment venues. And the most important point here, Your Honor, is the record shows that the board admits that public amusement and entertainment venues aren't any safer than salons or anything else. It's a totally irrational and arbitrary exemption that undercuts the entire health and safety rationale. Thank you, Your Honor. All right. Very well. Thank you for your argument to both counsel. The case is submitted. The court will deliberate and file an opinion in due course. Thank you very much. Please call the.